NOTICE

Decision filed 08/10/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260234-U

NOS. 5-26-0234, 5-26-0235 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* NATHAN S. and SOFIA S., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Williamson County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 24-JA-85, 24-JA-86 |
| | ) | |
| Ian S., | ) | Honorable |
| | ) | Amanda Byassee Gott, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Vaughan and Hackett concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court's judgment terminating Father's parental rights was not against the manifest weight of the evidence where the State met its burden of proving that he was unfit to parent and that termination was in the best interests of the minors. Therefore, the judgment of the circuit court is affirmed.

¶ 2     The respondent, Ian S. (Father), appeals from the March 12, 2026, order of the Williamson County circuit court terminating his parental rights over his two minor children. On appeal, Father challenges both the finding of unfitness and the determination that it was in the minors' best interests to terminate his parental rights. For the reasons explained below, we affirm.

1

¶ 3                                 I. BACKGROUND

¶ 4                 A. Adjudication of Neglect and Initial Proceedings

¶ 5     On November 20, 2024, the State filed petitions for adjudication of wardship concerning the minors Nathan S. and Sofia S., who were then two years old and seven months old, respectively. The State alleged that the minors were neglected due to an environment injurious to their safety. The petitions identified Father and Mikayla S. (Mother)[1] as the minors' parents. The State alleged that, on November 17, 2024, Mother and Father were involved in a domestic dispute in the presence of the minors. The dispute allegedly escalated into violence, with Father shoving and striking his own mother and stepmother, who were also present.[2] Father's stepmother attempted to call 911, but Mother grabbed the phone and threw it, breaking it. During the dispute, Father allegedly threatened to kill the whole family, including the two minors.

¶ 6     Father was arrested and charged with domestic violence.[3] When an investigator from the Illinois Department of Children and Family Services (DCFS) arrived, she noted visible injuries on Mother's face, but Mother would not state how she got them. Neither parent cooperated with the investigator's efforts to interview them. Mother admitted that Father's anger issues had gotten worse, but she stated that the family would "deal with it" upon his release from jail and return home.

¶ 7     After both parents had completed their integrated assessments, DCFS created service plans for them on January 23, 2025. Mother was recommended the following services: mental health, domestic violence victim services, parenting education, random drug screenings, stable housing, and employment. Father was recommended the following services: domestic violence perpetrator

---

[1]Mother filed her own separate appeal from the underlying matter.
[2]On January 30, 2025, the State filed amended petitions in both cases, striking the allegations referencing Father's assaults on the two additional family members.
[3]The charges were later dismissed.

treatment, mental health, parenting education, anger management, stable housing, and employment.

¶ 8    The circuit court entered an adjudicatory order on January 30, 2025, after accepting both parents' admissions to the State's allegations of neglect. The court determined that the minors were neglected due to an environment injurious to their welfare, based on its findings that the minors were present during a domestic violence incident involving Father and the minors' grandparents, and where Mother prevented an attempt to call for help. On February 27, 2025, the circuit court entered a dispositional order making the minors wards of the court and placing custody and guardianship with DCFS.

¶ 9    In a clinical report filed with the circuit court on April 24, 2025, a domestic violence clinician wrote that she did not recommend any domestic violence services for Father, because "although he did make threats against his entire family, there is no information to suggest a pattern of intimate partner violence due to a dynamic of power and control." However, the clinician did recommend a mental health assessment, due to the severe emotional dysregulation Father exhibited during the reported incident.

¶ 10    DCFS filed service plans for both parents on May 6, 2025. Mother and Father were rated unsatisfactory on obtaining appropriate and safe housing, and the report noted that they were referred to a housing advocate in January because they had been living in a shelter and then a hotel. The housing advocate reported that resources had been provided, and assistance was terminated in April because the parents reported that they no longer needed housing. However, at the end of April, the parents reported that they still needed assistance with finding housing, and another referral was made for a housing advocate.

¶ 11 The report also stated that Mother was unsatisfactory on obtaining stable employment, as she was still looking for a job. She was unsatisfactory on parenting services, and the service provider reported that Mother had not engaged with them despite three attempts to contact her. Mother and Father were both rated unsatisfactory in communicating with DCFS, and the report stated that while they were cooperative with their caseworker, they had not consistently engaged in services. She was further unsatisfactory on mental health, as she was not attending psychiatric or therapy appointments to address her several mental health diagnoses. Mother and Father were rated unsatisfactory for substance abuse, and neither had completed a substance abuse assessment. Lastly, Mother was rated unsatisfactory on domestic violence services, as she had yet to engage with them.

¶ 12 In addition to the aforementioned unsatisfactory ratings on obtaining stable housing, communicating with DCFS, and substance abuse, Father was unsatisfactory on employment. He was currently employed, but had not consistently provided his caseworker with paystubs or a work schedule. He had not engaged with parenting services, and was rated unsatisfactory in that area as well. However, he and Mother reported that they were on a waitlist to begin a parenting program. Similarly, Father was unsatisfactory on anger management and mental health, as he had not yet engaged with either service, although he was currently on a waitlist. Lastly, Father was unsatisfactory on domestic violence services. He had been given a contact to call, but had not done so. There had not been any new reports of domestic violence.

¶ 13 DCFS filed a permanency report on June 2, 2025. It stated that Mother was engaging in psychiatric care as of mid-February 2025, but had yet to start therapy, stating that she had to reschedule her appointment. The report noted that she seemed hesitant to engage in services, and often wanted to do them with Father rather than on her own. Mother reported several times that

4

she had tried to contact the provider for her domestic violence referral, but was unable to get through. Her caseworker attempted to help her, including by transporting her to appointments. The caseworker took Mother to her first two appointments in May and June of 2025, but when she arrived to take Mother to her third appointment, Mother became upset, yelled, and asked the worker if she wanted to fight her. Mother eventually agreed to be taken to the third meeting, and later blamed her outburst on nervousness about the appointment.

¶ 14    Mother and Father were scheduled to begin parenting classes on the day that the report was filed. The report stated that they would be signed up for in-person parenting services once they had secured stable housing. Mother and Father were living with Father's mother and stepmother, and the caseworker described the house as being "in deplorable condition and *** not safe for in home visits." The parents reported that they planned to rent a trailer. When asked how they would afford it, they stated that Father's mother and stepmother, who would also live with them, would pay the rent and all bills. Father's parents' income came from social security and disability benefits. At the time of the report, Mother had worked for two days, but then reported that she had to stop due to ankle pain from wearing too-large shoes. She further reported that she was looking for employment and had submitted applications to three food service businesses. Father was employed at the time of the report.

¶ 15    The report described Father as "reluctant to engage in [domestic violence] services" because the criminal charges against him were dropped. He was attending psychiatric services and reported that he was attending therapy, but the records sent to DCFS from the provider showed that he had not yet started. He was put on a waitlist from another counseling referral, and given the contact information for two other service providers. Mother and Father both tested negative for all substances on three random drug tests, although they each did not attend seven other random

5

test dates. Both parents told their caseworker that they would follow up with their substance abuse referrals, but neither had done so. Lastly, both parents were attending weekly supervised visitation with the minors.

¶ 16    The circuit court entered a permanency order on June 25, 2025. It found that Mother and Father were unsatisfactory on all services except visitation, with Father additionally being satisfactory on employment. The court further determined that neither parent had made reasonable efforts or reasonable and sustainable progress toward the minors' return home. The permanency goal was set to return home within 12 months.

¶ 17    DCFS submitted another permanency report on September 9, 2025. Mother had started attending psychiatric appointments monthly, and began mental health counseling in June of 2025. According to her treatment provider, her attendance at counseling was inconsistent. She also began domestic violence victim counseling in June of 2025 and had missed at least one session. She was not communicating with her caseworker to schedule a meeting to discuss how Father treated her. Mother and Father completed a parenting course as of early September 2025, and the instructor described them as "great students, always on time, and ready to take notes." They reportedly participated in class discussions, and even attended an extra class on grief after Father's mother passed away.

¶ 18    Mother had not completed a substance abuse assessment, while Father completed one in August of 2025 and was not recommended for further services. Both parents tested negative on two more drug tests since the last report. The parents' plans to move into safe and appropriate housing fell through with the passing of Father's mother, and they met with a new housing advocate in August. Father never attended meetings with the advocate. Mother was given housing

6

applications to complete, and was offered assistance in doing so. However, she never completed them and stopped returning the housing advocate's calls. They did not have safe, stable housing.

¶ 19    Mother remained unemployed, and Father continued to work at his previously-reported job. However, he never submitted paystubs or proof of employment. Father began domestic violence classes in May of 2025 and had completed 16 out of 25 sessions. He had not attended psychiatric appointments since February of 2025 and had not engaged in therapy. He completed an assessment for mental health and anger management in August of 2025 and was recommended to attend weekly therapy sessions for six months.

¶ 20    In its permanency order of September 25, 2025, the circuit court found Mother to be satisfactory for domestic violence, mental health, and visitation (although the court noted that she needed to improve her therapy attendance); and unsatisfactory for substance abuse and drug testing, stable housing, and employment. Both parents were found to have completed a portion of their parenting services, although the court noted that they still needed to complete the in-person portion, which required them to first obtain appropriate housing. Father was also found to have completed substance abuse services, given the results of his assessment. He was satisfactory on domestic violence, employment, and visitation; and unsatisfactory on mental health, drug testing (due to missing random test dates), and housing.

¶ 21    The circuit court found that both parents had made reasonable efforts toward the minors' return home, but not reasonable progress. Mother and Father still needed to find suitable housing, demonstrate that they had learned from their services, and engage in and/or complete their service plans. Additionally, Mother needed to obtain employment to support herself and the minors.

¶ 22    On November 4, 2025, DCFS filed a service plan dated October 29, 2025. As of late October, the parents were still rated unsatisfactory on housing, as well as on parenting services

7

given their lack of appropriate housing in which to raise the minors. Mother was unsatisfactory on finding employment, but started the process of applying for disability income. Mother was also noted to be inconsistent with engaging in services overall. She was rated unsatisfactory on mental health due to that inconsistent attendance. She also had not completed a substance abuse assessment. Both parents continued to skip random drug testing, although they both tested negative when they did attend. Nonetheless, they were rated unsatisfactory on substance abuse. Mother was also unsatisfactory on domestic violence services, as she had not attended classes since August of 2025.

¶ 23    Despite reporting that he remained employed, Father was unsatisfactory on employment due to inconsistently submitting paystubs. He started attending anger management counseling, but his attendance was inconsistent. He was rated satisfactory on anger management, but unsatisfactory on mental health services, as he was not engaging in general therapy. Father was satisfactory on domestic violence services, and had completed 21 out of 24 counseling sessions.

¶ 24    DCFS also submitted Mother's parenting capacity assessment, which was conducted in September and October of 2025. The assessment report stated that while Mother had a deep love for her children, she had "very minimal skills" relating to supporting them financially and providing a safe environment. She had not made the changes necessary to mitigate the risks that the minors would be exposed to domestic violence, environmental danger, and neglect if returned to her care. She also had not shown that she could maintain a safe and clean home environment for the minors, as demonstrated by her ongoing resistance to accepting assistance or allowing professionals into her home.

¶ 25    Her ongoing relationship with Father, whose aggressive outbursts and domestic violence led to the opening of the case, was troubling, as was Mother's reported plan to leave the state and

be cared for by a former partner. The assessor noted that this plan had the potential to repeat patterns of domestic violence. There was further concern that Mother was "not equipped with the skills of daily living that she would need" to keep her children and herself safe and healthy, particularly in light of her mental health conditions and possible developmental disabilities.

¶ 26 The assessor concluded that Mother was making "slight progress in her parenting journey, though it is far from complete." She displayed insight into her mental health and past traumas, and could connect her experiences to her current situation. However, she had not provided evidence that she could translate those insights into behavior and sound decision-making regarding the future safety of her children. The assessor opined that increasing her visitation freedoms was not a safe decision at the time of the assessment.

¶ 27 DCFS filed a permanency report on December 26, 2025. Mother was inconsistent in attending therapy; between June and November of 2025, she kept just over half of her appointments. The provider of Mother's domestic violence counseling reported to DCFS that Mother had not attended since August 13, 2025. Mother reported to DCFS that Father was physically abusive to her when he was under the influence, and he was trying to stop smoking marijuana because it made him violent. However, Mother stated that Father was verbally and emotionally abusive even when sober. In addition to herself, Father also directed his abuse at his mother and stepmother. Mother also shared that she was in contact with a former partner who lived in North Carolina; she described him as her "soul mate" and said that she planned to get a job, save up money, and regain custody of her children before moving to North Carolina to be with him.

¶ 28 Mother still needed to obtain safe, appropriate housing in order to complete the in-person portion of her parenting services requirement, in addition to completing her housing requirement.

Mother was not communicating with her housing advocate, and the advocate reported in mid-December that she had not made any progress. Additionally, Mother had not attended any of the seven drug tests scheduled between August and December 2025. As of late December, Mother reported that she was still looking for employment.

¶ 29    Father continued to not engage in psychiatric services. Since August of 2025, he had attended four therapy sessions and did not show up for three. Like Mother, he could not complete his parenting requirement without safe housing, and he was not submitting to any drug tests. He continued to report employment, but was not submitting paystubs or proof of employment. Father was not attending meetings with the housing advocate. Both parents continued to attend visitation.

¶ 30    The State filed a petition for termination of parental rights as to both parents on December 29, 2025. It alleged that Mother and Father were unfit to parent by reasons of (1) failing to protect the minors from conditions in their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2024)) and (2) failing to make reasonable progress toward the return home of the minors during the nine-month periods of January 30, 2025, through October 30, 2025, and March 30, 2025, through December 29, 2025 (*id.* § 1(D)(m)(ii)).

¶ 31    In its permanency order of January 8, 2026, the circuit court again found that Mother and Father had completed a portion of their parenting services requirement, but still needed to compete the at-home portion. Mother was unsatisfactory on her cooperation with DCFS, domestic violence, mental health, and housing. She was satisfactory on visitation and employment, and the court noted that she had applied for disability benefits. Her substance abuse and drug testing requirements were removed from her service plan. In addition to the aforementioned parenting services, Father was found to have completed domestic violence services and was satisfactory on visitation and employment, although he needed to show proof with regards to the latter. He was unsatisfactory

10

on cooperating with DCFS, mental health, drug screenings, and housing. The circuit court found that neither parent had made reasonable efforts or reasonable and sustainable progress toward the minors' return home.

¶ 32                                B. Fitness Hearing

¶ 33    The circuit court held a combined fitness and best interest hearing on March 12, 2026. Amy Slone testified on behalf of the State, explaining that she had been the DCFS caseworker assigned to the minors' case since the minors came into care in November of 2024. Slone stated that both parents' service plans included an integrated assessment, housing, employment, mental health, parenting, domestic violence, and substance abuse, the last of which was later removed from Mother's plan. Regarding housing, Slone testified that the parents' current living situation was unsafe. There was a large hole in the living room, inadequate heating, no running water, and structural issues. While the parents had not allowed Slone to visit their home until late January of 2026, they had previously reported these issues to her. She also observed that the home was dark, cluttered, and dirty, and there were feces and urine on the kitchen floor.

¶ 34    The State also introduced photos that Slone took during her home visit. The circuit court allowed the exhibits over Mother's counsel's objection that they were taken outside of the two nine-month periods alleged in the State's petition regarding lack of reasonable progress. The circuit court noted that the State's allegations that the parents failed to protect the minors from conditions injurious to their welfare had no time limit.

¶ 35    Slone next testified that both parents completed their domestic violence service requirements, although Father was "slow to get started." Slone also reiterated that the parents completed parenting classes, but could not complete the hands-on parenting requirement because of their housing situation. Regarding mental health and anger management, Father was originally

11

unsuccessfully discharged for not attending, but he completed a second mental health assessment in February 2026. He recently restarted counseling, which applied to both his mental health and anger management service requirements. By the time of the hearing, Father had not yet reengaged for long enough to receive psychiatric care. Mother was currently attending therapy, but Slone stated that there had been a period of time in which that was not the case. She had been attending psychiatric appointments throughout the life of the case and was taking her medication.

¶ 36    Mother was also working on her application for disability benefits, while continuing to look for employment. She worked for approximately one week in June 2025, but had otherwise been unsuccessful in finding a job. On cross-examination, Slone testified that Mother was developmentally disabled, and was receiving assistance with filling out her disability application because she struggled to do it on her own.

¶ 37    Overall, Slone testified that both parents had made "minimal" progress on their service plans over the span of the case. She identified transportation as a major barrier for them, but stated that she offered "over and over again" to take them to appointments. She added that the parents took her up on the offer "[s]ometimes," but there were also many instances where she arrived to transport them, but the parents did not come out. On cross-examination, Slone stated that Father had worked at his current job "for a while," and he had provided her proof of his employment the day of the hearing.

¶ 38    She also testified that Father, unlike Mother, did not have substance abuse services removed from his service plan. While his February 2026 substance abuse assessment did not result in any treatment recommendations, he had previously taken an assessment which did. However, he was unsuccessfully discharged due to lack of engagement, thus necessitating the second assessment. DCFS was concerned about his substance use because Father reported that when he

12

would smoke marijuana frequently, he would "black out or not realize what was going on," and he could not be there for his children in those times. Slone also denied that the period of time during which the parents were living in a homeless shelter and a hotel prevented Father from completing his services, because he still held employment during that time, and the places he was staying were close to where his services were. He also had a phone the entire time, and had been living with his parents for about a year.

¶ 39    Slone further explained that when the minors were removed, Nathan S. was dirty and underweight, and he had suffered from frequent ear infections. He made significant progress after being placed with a foster family, but he was undergoing testing to determine whether his health issues were related to malnourishment from when he was a baby. Slone opined that both parents loved their children, but there was an "inability," rather than an unwillingness, on both of their parts to safely care for the minors. She did not believe that correcting the conditions preventing reunification—in particular, their unsafe housing situation—had been a priority for the parents, and she did not foresee reunification as a possibility. Slone further testified that both parents' main barrier to parenting was not a lack of desire or love for their children, but their mental health.

¶ 40    Next, Father testified on his own behalf. He denied that he was ever recommended for substance abuse treatment, stating that after both assessments, he was told he did not "fit the criteria" for a substance abuse issue. He also testified that the "brief time" in which he and Mother were homeless was a barrier to his engagement in services, because he was devoting his full attention to finding a place to live. He and Mother moved back in with his parents once the criminal

13

charges against him for the domestic violence incident were dropped, and he was off of electronic monitoring.[4]

¶ 41    Father was asked about the steps he was taking to correct the condition of his home, to which he responded that he was "currently looking for someone" to make repairs, but that it was difficult to find help because the house was very old. However, he stated that he found someone who would fix the roof. He and Mother were also considering moving, and were aware that they had a housing advocate assisting them. He stated that he had not met with the advocate because of his work schedule, but he knew that Mother was working with her. He admitted that he would not let a child inside his current home due to the unsafe condition, and further admitted that this meant that a portion of the reasons why the minors came into care had not been fully corrected.

¶ 42    Mother testified that she had two domestic violence classes remaining in her course, and would complete the course by next Friday. She stated she was still looking for employment, but had not had any success. She was also filling out an application for disability benefits, but found the application very difficult. She agreed with Father's statements regarding their home. On cross-examination, she was asked whether, through her domestic violence classes, she had become aware of any issues she needed to resolve in her relationship. She answered that there were no domestic violence issues, and the only matter to resolve was housing.

¶ 43    Following argument, the circuit court announced its findings. It began by noting that this case was unusual because the issues that brought the minors into care—domestic violence and the failure to protect the minors from domestic violence—was no longer the most significant issue preventing their return, which was now adequate housing. The court further recognized that the

---

[4]There had previously been a no contact order in place preventing Father from living with his mother and stepmother.

14

State did not make allegations about the condition of the home in its petition, and the court lacked evidence of said condition at the start of the case.

¶ 44 However, the court found that the State had proven by clear and convincing evidence that the parents failed to protect the minors from conditions in their environment injurious to their welfare, because it was established that there was domestic violence in the home in the minors' presence. Furthermore, Father was still living with his stepmother, who was one of the victims of the domestic violence. Based on the exhibits and testimony, including the parents' own admissions, the circuit court found that the parents still did not have appropriate housing, and had not made reasonable progress in obtaining it. The court further found that in no nine-month period following the adjudication of neglect did either parent make reasonable and sustainable progress toward the return of the minors, and the current state of the home demonstrated that the parents were not close to reunification. Thus, the court determined that both parents were unfit, and proceeded directly to the best interest hearing.

¶ 45                            C. Best Interest Hearing

¶ 46 Chad Baker testified for the State, explaining that he and his wife had been both minors' foster parents since November of 2024. Chad[5] said he was a stay-at-home parent who quit working as a truck driver last August in order to spend more time with his children and focus on caring for them. He lived with his wife and their four children. One child was adopted, and the other three—which included the minors—were fostered. The two minors got along very well with the Bakers' five-year-old adopted daughter and nine-month-old foster son, treating them like siblings. The minors were current on their medical and dental care, and the Bakers took them to all of their

---

[5]As there are two witnesses with the surname Baker, we will refer to them by their first names for clarity.

15

appointments. Nathan S. was enjoying pre-kindergarten, and the Bakers were working to get him help with his hyperactivity. The school informed the Bakers that Nathan S. was playing and interacting with other children.

¶ 47 Chad further testified that he and his wife had been foster parents for almost eight years. Nathan S. was involved in various activities, including being in the Christmas pageant at church and taking tumbling classes. The Bakers had a strong network of friends near them and had regular contact with their extended family, who mostly lived a couple of hours away. Chad added that his brother had actually come to watch the minors the day of the hearing, and that the minors had a relationship with him.

¶ 48 If Mother and Father's parental rights were terminated, Chad and his wife were interested in and willing to adopt both minors. Nathan S. called him "daddy" and called his wife "mommy," while Sofia S. called them "dada" and "mama," respectively. The minors had lots of toys at the Bakers' house, and shared a bedroom.

¶ 49 Next, Ashley Baker testified that she was married to Chad Baker and foster mother to the minors. She stated that she and her husband had fostered 14 children and maintained relationships with the ones that returned home. Ashley worked full-time, but she and her husband made sure to have breakfast as a family and she enjoyed caring for the two minors. She and her husband were involved in a local support network for foster/adopt families, which provided services like classes for foster and adoptive parents and play groups for children. Ashley explained that Nathan S. had an Individualized Education Program (IEP) and received speech therapy at school, and the Bakers had Sofia S. in speech therapy as well. Both minors also required medical attention related to their malnourishment before they came into care. Ashley echoed Chad's testimony about having a strong network of friends in the area, and family who often visited them and vice versa. The minors

16

had relationships with Ashley's extended family as well. Ashley was committed to providing the minors permanency through adoption.

¶ 50    Lastly, Amy Slone testified again. She stated that she had observed the minors in their foster home and she had no concerns about their safety or wellbeing. She further felt that it was in the minors' best interests that Mother and Father's parental rights be terminated, because she believed that the parents were not able to adequately care for the minors and keep them safe. Slone stated that the most visitation the parents ever received in the case was two hours, once a week.

¶ 51    The circuit court stated that it had reviewed the evidence and heard the testimony, and listed the statutory factors that it needed to consider under the Juvenile Court Act. The court noted that it was clear that the parents loved their children. However, it found that "almost every [statutory] factor" weighed in favor of termination. Both minors had developmental and other health concerns, and the foster parents were getting them the appropriate care. The court also took judicial notice of the parents' testimony during the fitness portion of the hearing that their home was not safe for the minors to live in. The court did not believe that the parents, in their current circumstances, had the ability to provide for the minors' safety and wellbeing, including providing them with adequate food, shelter, healthcare, and clothing. Nor could they adequately care for the minors given the children's special needs.

¶ 52    The circuit court also found that the minors were clearly loved in their foster environment, and had various community ties, including church, school, friends, and the foster/adopt support network. The court also noted the importance of permanency for the minors, and found that they had permanency in their foster placement as well. The court did not believe that giving Mother and Father an additional six months, or even an additional year, would make a difference in this case. The parents had been living in their current home for over a year, and in that time, they had

17

made "virtually no efforts" to either put the home in suitable condition or obtain other housing. The parents also had limited income to provide for all of the minors' needs. Thus, the court found that it was in the minors' best interests that Mother and Father's parental rights be terminated.

¶ 53     The court also entered a written order stating these findings and its rulings on March 12, 2026. Father filed a timely notice of appeal from the circuit court's decision.

¶ 54                                    II. ANALYSIS

¶ 55     On appeal, Father argues that the circuit court's findings that he was an unfit parent and that termination of his parental rights was in the minors' best interests were against the manifest weight of the evidence.

¶ 56                A. The Circuit Court's Finding of Unfitness

¶ 57     A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P*., 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *Id.* Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2) (West 2024); 750 ILCS 50/1(D) (West 2024). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 58     Here, the circuit court based its unfit-person ruling on the failure to protect the minors from conditions in their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2024)) and

18

a lack of reasonable progress (*id.* § 1(D)(m)(ii)). Section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed unfit. However, only one properly proven ground is sufficient to enter a finding of unfitness. See *id.* § 1(D) (stating that the grounds of unfitness "are any one or more" of an enumerated list); see also *In re C.W.*, 199 Ill. 2d 198, 210 (2002). We begin our review with the failure to make reasonable progress, and find that the circuit court properly found Father unfit on this ground. Therefore, we need not address its finding pursuant to section 1(D)(g) of the Adoption Act. However, we note that the evidence we discuss below would support the circuit court's finding under either statutory ground for unfitness.

¶ 59      As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
>
> * * *
>
> (m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(m)(ii) (West 2024).

¶ 60      Under the Adoption Act, "reasonable progress" is determined by an objective standard, which is based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The Adoption Act provides guidance for measuring reasonable progress as follows:

> "If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan ***." 750 ILCS 50/1(D)(m)(ii) (West 2024).

Under section 1(D)(m) of the Adoption Act, the benchmark for measuring reasonable progress "encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known

that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 III. 2d 181, 208 (2001)).

¶ 61    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *Id.* Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 62    On appeal, Father argues that the circuit court did not properly consider the evidence of his reasonable progress. He states that he completed DCFS's integrated assessment, cooperated with DCFS through communicating with his caseworker and signing all release forms, and maintained full-time employment throughout the proceedings. The circuit court consistently found him to be satisfactory on the employment requirement of his service plan. He also completed domestic violence services in November of 2025 and consistently attended visitation.

¶ 63    He further contends that he completed parenting education and even took additional classes on grief and self-care after the death of his mother. He attributes any delays in completing parenting education to DCFS not scheduling his parenting capacity assessment until January of 2026—after the State had filed its petition to terminate parental rights—and then rescheduling it to April of 2026 because the heat in the testing location was not functioning on the January date. Thus, Father argues that the State sought termination of his parental rights before he was able to complete an assessment that DCFS deemed relevant to his parenting capabilities.

20

¶ 64    Next, Father argues that he completed a substance abuse assessment in August of 2025 and was not recommended any further substance abuse treatment. He acknowledges that he missed random drug tests, but explains that this was due to illness, work conflicts, "or other absences," and notes that all of the tests he did take were negative for all substances. He "attempted to comply with mental health requirements despite significant barriers," citing his lack of health insurance throughout most of the case, provider availability, and waitlists. He adds that he completed mental health assessments in August of 2025 and February of 2026, and reengaged in mental health services following the second assessment. Overall, Father argues that where DCFS's actions, rather than his own, frustrated his efforts toward reunification, his fitness should be judged by his demonstrated intent rather than by ultimate success alone. See *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 54.

¶ 65    Lastly, regarding housing, Father argues that he testified that housing was an issue throughout the case, starting with the period in which he was effectively homeless due to restrictions stemming from his criminal case. He also contends that he testified that he was working with housing advocates, completed housing applications, and continued to work on obtaining the documentation necessary to pursue housing opportunities. On appeal, as before the circuit court, Father acknowledges the home's significant structural issues and unsanitary condition. However, he argues that he sufficiently demonstrated that he was addressing this issue, and that the existence of "a single unresolved barrier" in the form of housing does not negate his progress in every other area.

¶ 66    We first note that a portion of Father's arguments relate to the specific barriers he faced in completing his service plan. Reasonable progress is measured by an objective standard, under which a parent's personal circumstances that impede his ability to make said progress are

21

irrelevant. See *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 73 (stating that while the respondent's incarceration impeded his progress, his personal circumstances were irrelevant to the objective standard); *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89. Thus, we need not consider his arguments relating to his period of homelessness during his criminal case, his scheduling conflicts with random drug testing, and his various obstacles to engaging in mental health services.

¶ 67    Furthermore, as Father notes, even where he faced delays caused by DCFS and outside of his control, we look to his intent to complete his services. The testimony at the fitness hearing and DCFS reports showed that Father was unsatisfactorily discharged from mental health services due to a lack of attendance, and had only recently reengaged in services. Throughout the case, Father was noted to be unsatisfactory on mental health. At times, he was on a waitlist for services, and at times, he was simply not regularly attending appointments. The latter is indicative of his intent to complete this service requirement.

¶ 68    Similarly, Father's and Slone's testimony regarding housing demonstrated his lack of intent to obtain safe and appropriate housing for the minors within either nine-month period alleged by the State. He and Mother did not allow DCFS to complete a home inspection, but both admitted that the house was in substandard condition. Father testified that he would not let a child into the house in its current state. Despite this awareness, and despite being offered a housing advocate at two points during the case, Father testified that he was still looking for someone who could make the necessary repairs, and while he and Mother had discussed moving, he had never met with the housing advocate.

¶ 69    Furthermore, Father severely minimizes the importance of obtaining safe, appropriate housing among his required services. As the circuit court noted, the condition of the home was not originally a significant factor in the minors' removal, but it became a major barrier to the minors'

22

return home during the life of the case. However, reasonable progress is measured not only in the context of conditions giving rise to removal, but also conditions that later become known and prevent reunification. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17.

¶ 70 Moreover, housing became an obstacle to Mother and Father's completion of their parenting service requirement, as Father acknowledges on appeal. Although he clearly made some progress on parenting by completing classes, he made no progress on the hands-on portion due to the condition of his home. Additionally, the circuit court found that the parents' living situation and their insufficient effort to either improve the home or obtain new housing prevented the foreseeability of reunification in the near future. The court also noted that there remained a risk of domestic violence—the primary reason for the minors' removal—as Father was still living with at least one of the victims of his abuse.

¶ 71 Thus, we find that the circuit court's determination of parental unfitness based on Father's lack of reasonable progress during both of the State's alleged nine-month periods was not against the manifest weight of the evidence. Therefore, the court did not err in finding Father unfit to parent the minors.

¶ 72 B. The Circuit Court's Best-Interest Finding

¶ 73 Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

23

¶ 74　In making a best-interest determination, the court must consider several factors, within the context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2024). The factors are as follows:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

¶ 75　As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *Id.* ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 76　On appeal, Father does not dispute that the evidence established that the minors were placed with foster parents who met their needs and provided stability, permanence, care, and a safe environment. However, he argues that he remained actively involved in the minors' lives throughout the case by consistently attending visitation and maintaining contact, to the limited extent allowed by DCFS. He also states that he worked toward reunification by maintaining full-time employment, completing parenting and domestic violence services, consistently producing negative drug test results, participating in mental health services, and cooperating with DCFS. He adds that the "permanent destruction" of the relationship he worked to maintain during the life of the case would be a drastic action. He acknowledges that housing remained a barrier to reunification, but argues that "[h]ousing assistance efforts remained ongoing."

24

¶ 77    We initially note that it was undisputed that both parents loved their children. However, a parent's desire to continue his parental role in the child's life is not a relevant factor at this stage. See *In re D.T.*, 212 Ill. 2d at 364. The appropriate measure of a minor's best interests is the list of statutory factors found in section 1-3(4.05) of the Juvenile Court Act. Father does not dispute—nor could he—that at least four of these factors favor termination. The minors clearly had their physical safety and welfare provided for in their foster placement, whereas Mother and Father could not provide safe housing and the minors came to foster care with medical issues.

¶ 78    The uncontroverted testimony of the Bakers and Slone supported a finding that the minors had love, attachment, and security with their foster family, and keeping the minors in the home they had been living in since November of 2024 would be the least disruptive option. The minors also undoubtedly had permanence and stability in their foster placement, which was particularly important for children with developmental concerns. Father also does not identify any risks associated with keeping the minors with their foster family, and both foster parents expressed their willingness to adopt.

¶ 79    While neither minor was old enough to voice a preference, Sofia S. was not even a year old when she was placed with the Bakers, and had spent most of her life with them. Nathan S. was involved in school, making friends, and participating in activities in the community. Both minors had attachments to their foster siblings and the Bakers' extended family, while maintaining their sibling relationship with one another.

¶ 80    As the circuit court found, the statutory best interest factors weighed overwhelmingly in favor of termination. Despite the parents' clear love for their children, the evidence was clear that they were unable to provide for their needs. By contrast, the minors' physical, mental, and emotional needs were being met in their foster home. Furthermore, both foster parents testified

that they were willing and able to provide the minors with permanency through adoption, if the parents' rights were terminated. We therefore find that the circuit court's best interest ruling was not against the manifest weight of the evidence.

¶ 81                                    III. CONCLUSION

¶ 82    For the reasons stated, the circuit court did not err in terminating Father's parental rights. The judgment of the circuit court is affirmed.


¶ 83    Affirmed.